**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**DAVID HUNT**

                                        **Plaintiff,**

        **v.**                                        **No. 07-CV-1029**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                                        **Defendant.**

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -**

**THOMAS J. McAVOY**
**Senior United States District Judge**


                        **DECISION and ORDER**

        David Hunt ("Hunt") brought this suit under sections 205(g) and 1631(c)(3) of the Social

Security Act ("Act"), as amended, 42 U.S.C. sections 405(g) and 1383(c)(3), to review a final

determination of the Commissioner of Social Security ("Commissioner") denying Claimant's

application for disability insurance benefits and Supplemental Security Income ("SSI")

benefits.  Presently before the Court are the parties' motions for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

**I.    FACTS**

        **a.        Procedural History**

        Plaintiff David W. Hunt filed an application for disability insurance benefits on October

15, 2000 [Administrative Transcript ("AT") 263].  He alleges disability since March 15, 1995

[AT 58] due to T-12 compression fracture; bulging disc at L4-5 and L5-S1 with 50% loss of

height at L4-5; and facet joint synovitis/arthralgia.

The claim was originally denied by Administrative Law Judge Barry E. Ryan's decision dated June 26, 2002 [AT 18-24].  Hunt filed a request for review by the Appeals Council on July 23, 2002 [AT 10].  The Appeals Council denied the request for review by notice dated February 17, 2004 [AT 5-7]. After the Appeals Council denial review, Hunt commenced a civil action in district court.  By stipulated remand pursuant to the fourth sentence of 42 U.S.C.§405(g), the case was returned to the Appeals Council and, by Appeals Council Order dated December 29, 2004, the case was remanded to an administrative law judge for a decision consistent with its Order.

On remand, a hearing was held on March 28, 2006 before Administrative Law Judge Robert E. Gale (the "ALJ").  Hunt testified as did vocational expert David Festa.  The ALJ issued an decision dated May 24, 2006 that was unfavorable to Plaintiff, and Plaintiff filed exceptions to the ALJ's decision with the Appeals Council on June 19, 2006.  The Appeals Council declined to accept jurisdiction on August 4, 2007 [AT 243-247] and this civil action followed.

**b.     Medical/Employment History**

Hunt initially hurt his back in a skydiving incident in 1985, when he suffered a T12 compression fracture of his spine [AT 118,124].  He was hospitalized for 9 days, fitted for a back brace, and then provided physical therapy. [AT 266].  The vertebrae fused, but the pain persisted [AT 124].  He was able to "return to work in a management position" [AT 266] with the trucking company he had previously worked for as a driver [AT 124].

Hunt was 40 years old at the alleged onset date of disability of March 15, 1995 [AT 58], and was 46 years old on the dated last insured - December 31, 2000. [AT 266, 270].  He completed high school and had past relevant work as an automobile detailer, trucking

company dispatcher, and fuel attendant.  [AT 78, 85, 270].  He has not engaged in

substantial gainful activity since the alleged onset date.[1]  On August 1, 1995, Hunt's primary

care physician referred him to orthopedic specialist Dr. Stephen Robinson due to "probable

arthritis" in his back [AT 136].  Treatment notes from Hunt's primary care physician dated

April 3, 1998 indicate increased pain and decreased muscle strength in both legs [AT 142].

On April 28, 1998, Hunt was evaluated by Dr. David deDianous.  Hunt was tender to

palpation over the thoracolumbar junction, which Dr. deDianous opined was likely related to

the compression fracture [AT 127].  He was tender over the L4-5 and L5-S1 interspace [AT

127].   Upon review of the MRI, Dr. deDianous observed disc desiccation at L4-5 and L5-S1

[AT 127, 130].  There was 50% loss of height at L4-5 [AT 127].  There was a wedging at T12

from the old compression fracture and some fatty infiltration of the phylum [AT 127].  There

was a diffuse disc bulge at L4-5 [AT 127].  Dr. deDianous diagnosed lumbar discogenic

disease, facet joint synovitis/arthralgia, deconditioning and soft tissue tightness [AT 127].  Dr.

deDianous recommended diagnostic facet joint injections at L4-5 and L5-S1 and physical

therapy and prescribed Daypro 600 mg [AT 128].   However, the claimant cancelled his

appointments for the facet joint injections after considering the possible complications, and

stated in May 1998  that he had "joined Champion's Gym and is starting to do an

independent program there under the guidance of some of the physical trainers there." AT

129.

---

[1]Plaintiff left the management position at the trucking company, purportedly because of his back pain [AT 124].

On February 23, 1999, treatment notes from Hunt's primary care physician reveal continued back pain with an inability to bend, sit or stand due to pain [AT 144].  On November 16, 2000, Hunt was consultatively examined by Myra Shayevitz, M.D. [AT 153]. Dr. Shayevitz observed Hunt to sit with his weight on his hands [AT 154].  His gait was wide-based and had a stiff quality [AT 154].  When he attempted to walk on his heels, he was immediately off balance [AT 154].  When he walked on his toes, he limped badly and came right down [AT 154].  Dr. Shayevitz "was impressed with the degree of distress in [Hunt]" and noted that "it was obvious" that Hunt's wife was used to helping Hunt to get dressed [AT 154].  Dr. Shayevitz found Hunt to forward flex to 10 degrees, limited by pain [AT 155].  There was lumbar tenderness and right and left paraspinal tenderness.  Straight leg raising was positive bilaterally at 30 degrees [AT 155].  There was decreased sensation to pinprick in the left thigh [AT 155].  Reflexes were absent at knees and Achilles tendons [AT 155].  Dr. Shayevitz opined Hunt's prognosis was "very guarded", noting that his condition was longstanding [AT 155].   Dr. Shayevitz concluded Hunt could not sit for a prolonged period of time [AT 155].  Standing, walking, stair climbing was very limited [AT 155].  He could lift and carry something light, but not repeatedly [AT 155].  Handling small objects rapidly or repetitively might aggravate his neck [AT 155].

In April 2001, state agency review physician Sury Putcha, M.D. reviewed the claimant's file as compiled at that time and determined that a residual functional capacity off sedentary work would be appropriate. [AT 269].

Hunt underwent an MRI of the lumbar spine on June 26, 2001 [AT 344].  The impression was moderate annular bulge at L4-5 entering both foramina and superimposed on the annular bulge was a possible right paramedian disc herniation [AT 344].  There was

degenerative desiccation of the L5-S1 disc space with an annular bulge [AT 345].  In reliance on the MRI results, on July 17, 2001, Dr. Robinson recommended electrodiagnostic studies and renewed physical therapy for back and trunk strengthening [AT 177].

Hunt saw Scott Gingold, M.D. on August 31, 2001 for a neurosurgical evaluation at the request of Jeffrey Lape, P.A. [AT 346].  Hunt's chief complaint upon presentation was severe back pain [AT 346].  The pain was described as constant, in the lower back, radiating down into his groin and down the left leg [AT 346].  He described the pain as an aching sensation to a sharp pain [AT 346].  The pain was rated as ranging from a "7 to a 20" on a pain scale [AT 346].  Changing position from seated to standing, sitting, walking and prolonged standing increased his pain [AT 346].  With prolonged standing, the pain would radiate up his spine to his shoulders [AT 346].  Prolonged sitting caused pain in his buttock; bending increased his pain [AT 346].  He had tingling along the lateral aspect of his left knee, weakness in his left leg and trouble walking [AT 346].  On examination, deep tendon reflexes were diminished in the right lower extremity [AT 348].  Dr. Gingold's conclusion was that symptoms did not correlate well with clinical findings [AT 348].  Dr. Gingold recommended conservative treatment over surgery [AT 348].

On November 16, 2001, Dr. Robinson noted the electrodiagnostic studies revealed bilateral L5 radiculopathy [AT 178].  X-rays showed 60 degrees of tilting at L5 and S1 and 5 degrees at L4-5 [AT 178].  There was loss of disc space height at L4-5 [AT 178].  Dr. Robinson reviewed the MRI scan again, and noted central to right sided disc herniation with some extension of the disc into the foraminal bilaterally [AT 178].  Dr. Robinson opined the MRI scan correlated with the electrodiagnostic and clinical findings [AT 178].  Upon examination, there was decreased sensation in the left L5 dermatome [AT 178].  Leg raising

to 90 degrees produced pain, bilaterally [AT 178].  Dr. Robinson's impression was chronic lumbar radicular syndrome secondary to L4-5 herniated disc [AT 178].  Dr. Robinson suspected lateral stenosis [AT 178]. The plan was to proceed with surgery "because of the severity and duration of his symptoms" [AT 178].  Dr. Robinson advised Hunt that "with the long duration of symptoms" he could not promise that surgery would relieve the pain, as he "may have some degree of neurological injury from the prolonged compression" and also had considerable degenerative change to his back [AT 178].

On March 1, 2002, Hunt sought a second opinion regarding the pending surgery from August R. Buerkle, Jr., M.D. [AT 186].  Dr. Buerkle noted obvious disc degeneration at L4-5. He opined Hunt may be a candidate for a discogram involving L3-4, L4-5 and L5-S1 and for a fusion attempt at the lower spine, but he did not recommend the laminectomy disc excision at L4-5, as planned by Dr. Robinson [AT 186].

Dr. Robinson's treatment notes dated March 8, 2002 again stressed the "long history" of back and leg pains [AT 181].  In discussing the outcome of surgery, Dr. Robinson wrote, "with the long duration of his history I certainly cannot promise him that this operation will relieve his symptoms as there may be some degree of permanent neurological damage" [AT 181].  A L4-5 right microlumbar discectomy was recommended. [AT 181].

Hunt had a laminotomy disc excision on the right side at L4-5 in 2002, but contended that, post-surgery, he felt pains in the right leg that was different than what he felt pre-surgery and that the post-surgery pains "were worse" than the pains experienced pre-surgery  [AT 183].  Plaintiff also had "the same complaints about his low back" after the surgery. Id.

On January 23, 2003, Hunt was referred to Nabil A. Aziz, M.D. by Dr. Robinson for a neurological evaluation of movements that occur when he is lying supine or on his side [AT

187].  The movements were present for the past two or three years [AT 187].  Dr. Aziz's impression was that the myoclonic jerking movements required further evaluation, but could be related to myelopathy or a lesion at the cervicomedullary junction [AT 188].  He recommended an MRI of the brain, cervical and thoracic spine [AT 188].

A treatment note from Syracuse Orthopedic Specialists dated February 6, 2003 indicated Hunt remained disabled from any occupation, with the myoclonic jerking movements interfering with the slightest activity [AT 189].  An EEG was administered on February 11, 2003 [AT 373].   The results were normal [AT 373].

On April 6, 2003, Dr. Robinson completed an Attending Physician Statement, in which he opined Hunt had been disabled since March 1995 from any occupation, and that he did not expect Hunt to be able to return to work in the future [AT 194].

Hunt saw Dr. Aziz on June 16, 2003 for follow up on his history of involuntary jerky movements of the upper and lower extremities [AT 349].  The medication Depakote was noted to have helped Hunt to an extent, but resulted in side effects of drowsiness [AT 349].  Dr. Aziz continued Depakote 500 mg and started Lamictal 25-mg [AT 349].

In a medical source statement dated September 15, 2005, Dr. John Merola noted diagnoses of herniated lumbar disc status post surgery in 2003 and depression [AT 350].  Prognosis was "poor" [AT 350].  Dr. Merola noted the presence of depression and anxiety, along with Hunt's physical impairments [AT 351].  Dr. Merola opined that Hunt could not walk without rest or pain for more than one block [AT 351].  Dr. Merola limited Hunt to sitting, standing/walking less than two hours [AT 352].  Dr. Merola opined Hunt required a cane and could never, in a competitive work environment, lift 10 pounds, stoop, climb, or crouch [AT

353].  Dr. Merola repeatedly stated in the medical source statement that Hunt was "unable to work" [AT 352].

Hunt returned to Dr. Robinson on October 17, 2005 for re-evaluation of his back, which was "getting steadily worse" [AT 381].  Hunt had back and bilateral leg pain radiating down the posterior calves, left more than right [AT 381].  He reported frequent and uncontrollable spasms in his back, which he said had been happening for quite some time [AT 381].

Dr. Robinson observed that Hunt was moderately obese and moved with moderate discomfort [AT 381].  On examination, Hunt's lumbosacral spine was tender to palpation bilaterally [AT 381].  All motions of the spine seemed to trigger shaking spasms [AT 381].  Dr. Robinson noted in his conclusion that Hunt continued to have lumbar radicular complaints which were increasing [AT 382].  Dr. Robinson recommended an updated gadolinium lumbar MRI scan [AT 382].  It was noted that conservative treatments such as TLSO were not helpful and that EMG was significant for paraspinal denervation and atrophy [AT 382].

Lumbar spine MRI performed October 19, 2005 revealed an old fracture involving the body of T12 with 30% - 45% loss of height; degenerative disc change at L4-5 and L5-S1; broad based disc protrusion at L4-5; and central disc protrusion at L5-S1 [AT 385, 371].

When Hunt returned to Dr. Robinson on October 31, 2005, his symptoms of back pain radiating to the legs, and muscle spans, were ongoing [AT 386-387].  On examination, he was tender to palpation and all motions of the spine, as at previous examinations, seemed to trigger shaking spasms [AT 387].

c.        The ALJ's Analysis

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The administrative regulations established by the Commissioner require the ALJ to apply a five-step evaluation to determine whether an individual qualifies for disability insurance benefits.  See 20 C.F.R. §§ 404.1520, 416.920; see also Williams v. Apfel, 204 F.3d 48, 48–49 (2d Cir. 1999); Bush v. Shalala, 94 F.2d 40, 44–45 (2d Cir. 1996).

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment which is listed in Appendix 1 of the regulations, [t]he [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Barry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

Prior to applying this five-step framework, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2000.  AT 266.  Thus, Hunt had to establish disability prior to or on December 31, 2000. See 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); 20 C.F.R. §§ 404.130, 404.131(b), 404.315(a); see also Arnone v. Bowen, 882 F.2d 34, 37–38 (2d Cir. 1989).

In the first step of the five-step analysis, the ALJ found that Hunt had not engaged in substantial gainful employment "at any time relevant" to this proceeding. AT 266.  At step two, the ALJ determined that Hunt's back condition was a "severe impairment."  Id.  At step three, the ALJ determined that Plaintiff's impairments failed to meet or equal the level of

severity of any impairment listed in Appendix 1, subpart P, 20 C.F.R. § 404.1520(d).  AT 267.

At step four, the ALJ found that Hunt did not retain the RFC to perform any past relevant

work.  AT 270.  At step five, after consulting the Medical-Vocational Guidelines, 20 C.F.R.

Part 404, Subpart P, Appendix 2, the ALJ found that Plaintiff's RFC was such that "there

were jobs that existed in significant numbers in the national economy" that the claimant could

have performed.  AT 271.

## II.    STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.  See

42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the

correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v.

Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990);

Shane v. Chater, No. 96-CV-66, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997) (Pooler, J.)

(citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must

determine whether the Commissioner's findings are supported by substantial evidence in the

administrative record.  See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912

F.2d at 11; Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's

finding will be deemed conclusive if supported by substantial evidence.  See 42 U.S.C. §

405(g); see also, Perez, 77 F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)

("It is not the function of a reviewing court to determine de novo whether a claimant is

disabled.  The [Commissioner's] findings of fact, if supported by substantial evidence, are

binding.")(citations omitted).  In the context of Social Security cases, substantial evidence

consists of "'more than a mere scintilla'" and is measured by "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales,

402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated

Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126 (1938)).  Where

the record supports disparate findings and provides adequate support for both the plaintiff's

and the Commissioner's positions, a reviewing court must accept the ALJ's factual

determinations.  See Quinones v. Chater, 117 F.3d 29, 36 (2d Cir. 1997) (citing Schauer v.

Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir.

1990).

## III.   DISCUSSION

### a.        Disability under section 1.04 of the Listings

At step 3 of the sequential evaluation process, the ALJ found that "[t]hrough the date

last insured, the claimant did not have an impairment or combination of impairments that met

or medically equaled one of the listed impairments in CFR Part 404, Subpart P, Appendix 1

(20 CFR §§ 404.1520(d);, 404.1525; and 404.1526)," stating only that "Listing 1.04 was

considered" [AT 267].  Plaintiff argues that the ALJ erred in failing to explain his findings in

connection with the Section 1.04 listing.  In this regard, Plaintiff contends that "[w]hile the ALJ

summarized the medical evidence elsewhere in the decision, he did not evaluate it under the

requirements of Listing 1.04."

> Plaintiff has the burden of proof at step three to show that [his] impairments meet
> or medically equal a Listing. Naegele v. Barnhart, 433 F.Supp.2d 319, 324
> (W.D.N.Y. 2006). To meet a Listing, Plaintiff must show that [his] medically
> determinable impairment satisfies all of the specified criteria in a Listing. 20 C.F.R.
> §§ 404.1525(d), 416.925(d). If a claimant's impairment "manifests only some of
> those criteria, no matter how severely," such impairment does not qualify. Sullivan
> v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L.Ed.2d 967 (1990) (citing
> S.S.R. 83-19, 1983 WL 31248).

 Rockwood v. Astrue, 614 F.Supp.2d 252, 272 (N.D.N.Y. 2009)

"An ALJ must set forth the factors justifying [his] findings with sufficient specificity to allow a court to determine whether substantial evidence supports [his] decision." Lunan v. Apfel, 2000 WL 287988, at *2 (N.D.N.Y. March 10, 2000) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984)).  "However, if an ALJ's decision lacks an express rationale for finding that a claimant does not meet a Listing, a Court may still uphold the ALJ's determination if it is supported by substantial evidence." Rockwood, 614 F.Supp.2d at 272 (citing Berry v. Schweiker, 675 F.2d 464, 468 (2d Cir.1982)).

While the ALJ did not elaborate on his findings in the portion of his decision addressed to step 3, the record contains substantial evidence supporting the ALJ's determination that Plaintiff did not meet the requirements of Listing 1.04.  A disability under Listing 1.04 requires an image of the herniated nucleus pulposus (herniated disc), evidence of neuro anatomic distribution of pain, limited motion, motor loss, sensory loss, and positive straight leg raising tests.  20 C.F.R. Pt. 404, Subpt. P, App. 1.[2]  Motor loss can be shown either by evidence of muscle atrophy or muscle weakness.  Rutkowski v. Astrue, 2009 WL 2227282, at *10 (N.D.N.Y. July 23, 2009).   A claimant's failure to show evidence of motor loss is substantial evidence that he is not disabled under Listing 1.04.  See Rockwood, 614 F.Supp.2d at 273; see also Johnson v. Commissioner of Social Sec., 263 Fed. Appx. 199, 203 (3d Cir. 2008)

---

[2]Listing 1.04 provides in pertinent part:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
          A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain,

limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 1.

(although Claimant showed some evidence of listed medical criteria, lack of evidence of motor loss was sufficient to support ALJ's finding of no disability).

Hunt presented evidence meeting some of the criteria of 1.04.  However, notably absent is any evidence of motor loss.  Id.  The Court, having conducted its own review of the record, notes that Plaintiff has complained that his legs "g[a]ve out" in testimony supported by his wife and daughter, and complained to Dr. Gingold of weakness in his legs.  AT at 22, 346.  Nevertheless, during the same appointment with Dr. Gingold that Claimant complained of weakness, the doctor administered a strength test and found "lower extremities are rated at full strength (5/5)."  AT at 347.  Further, during the consultative examination on November 16, 2000, Plaintiff was given a strength test and was rated 4-5/5.  AT at Exh. B5F.  There is not substantial medical evidence of motor loss.  Thus, the ALJ's conclusion that Plaintiff does not satisfy the requisite indicia of disability under Listing 1.04 is supported by substantial evidence.

### b. 	The ALJ's rejection of Plaintiff's Credibility

Plaintiff argues that the ALJ erred in rejecting his credibility as to the severity of his symptoms.

> "[A] claimant's subjective evidence of pain is entitled to great weight where . . . it is supported by objective medical evidence." Simmons v. U.S. R.R. Retirement Bd., 982 F.Supp 49, 56 (2d Cir. 1992) (citations omitted). "However, the ALJ is 'not obliged to accept without question the credibility of such subjective evidence.' " Martone v. Apfel, 70 F.Supp.2d 145, 151 (N.D.N.Y.1999)(quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1979)).  When rejecting subjective complaints, an ALJ must do so "explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." Brandon v. Bowen, 666 F.Supp. 604, 608 (S.D.N.Y.1987); see SSR 96-7p, 1996 WL 374186, at *4.  If the ALJ's findings are supported by substantial evidence, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y of Dept. of Health & Human Servs., 728 F.2d 588, 591 (2d Cir.1984).

The "ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record." Borush v. Astrue, No. 3:05-CV-361, 2008 WL 4186510, at *12 (N.D.N.Y. Sept. 10, 2008) (citing 20 C.F.R. §§ 404.1529, 416.929; Foster v. Callahan, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998)); see S.S.R. 96-7p, 1996 WL 374186, at *2. First, the ALJ must determine whether the claimant has medically determinable impairments, "which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(a); S.S.R. 96-7p, 1996 WL 374186, at *2. "This finding does not involve a determination as to the intensity, persistence, or functionally limiting effects of the claimant's pain or other symptoms." McCarty v. Astrue, No. 5:05-CV-953, 2008 WL 3884357, at *8 (N.D.N.Y. Aug. 18, 2008) (citing S.S.R. 96-7p, 1996 WL 374186). "If no impairment is found that could reasonably be expected to produce pain, the claimant's pain cannot be found to affect the claimant's ability to do basic work activities." Id. Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. S.S.R. 96-7p, 1996 WL 374186, at *2; 20 C.F.R. § 404.1529(c); Borush, 2008 WL 4186510, at *12. Because "an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," S.S.R. 96-7p, 1996 WL 374186, at *3, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 416.929(c)(3)(i)-(vii).

Rockwood, 614 F.Supp.2d at 270-71.

As the ALJ indicated in his decision, Plaintiff's testimony regarding his symptoms and daily activities were inconsistent with the medical evidence which related to the period prior to December 31, 2000, when Plaintiff's insured status expired (see AT 270). The ALJ noted that Plaintiff's MRI evidence from 1998 showed only bulging discs at L4-5 and L5-S1 (AT 270; see AT 124). Plaintiff's clinical findings revealed fairly normal gait, negative straight leg raising, negative Faber's test and normal motor, sensory and reflex exam (AT 124). Dr. deDianous' examination revealed that plaintiff had good strength, negative Faber's test, and

unremarkable gait and heel/toe walking (AT 127).  And the ALJ noted that Dr. Merola's treatment notes showed mostly treatment for acute maladies such as stomachaches and upper respiratory symptoms (AT 270). Thus, there was substantial evidence in the record to support the ALJ's determination that Plaintiff's testimony was not credible.

Plaintiff argues that the ALJ erred by failing to consider factors (3), (5), and (6) in the assessment.  However, the ALJ considered factor (3), precipitating or aggravating factors, by noting that Plaintiff experienced pain when he bent, walked, or sat.  AT  269.  The ALJ also considered factor (6), measures used to relieve pain, by noting that the Plaintiff testified that he could sit in a recliner and watches TV most of the day and by listing four pain medications that Plaintiff took.  AT 270.  Finally, while the ALJ did not mention factor (5), treatment other than medication received for relief of pain, the Court has found no evidence in the record that Plaintiff underwent any such treatment, and the Plaintiff has not pointed to any such treatment during the insured period.  The ALJ properly considered the seven factors in assessing Plaintiff's credibility.

Plaintiff additionally argues that Hunt's significant work history entitles him to substantial credibility.  While it is true that a claimant's long work history "lends significant weight to [his] subjective complaints [. . .], it is by no means a dispositive factor."  Wanzo v. Commissioner of Social Sec., 2008 WL 3925542, at * 4 (N.D.N.Y. Aug. 20, 2008).  The ALJ is entitled to deference in his assessment of credibility when, as here, he sees the Plaintiff testify and is able to assess his demeanor.  Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).  Based on the foregoing, the Court finds that the ALJ did not err when he found Plaintiff's testimony regarding the severity of his pain to be not entirely credible.

### c.        The ALJ's assessment of treating physician Dr. Merola's opinion

Plaintiff's treating physician, Dr. Merola, provided his treatment notes and a medical source statement dated September 15, 2005 in which he provided his opinion of the function-by-function limitations caused by Plaintiff's impairments.  The limitations indicated by Dr. Merola equated with an ability to perform substantially less than the full range of sedentary work.  SSR 83-10.  Plaintiff argues that the ALJ erred because he did not follow the treating physician rule (SSR 96-2p, 20 C.F.R. §404.1527) and afford Dr. Merola's medical source statement controlling weight.  On this issue, the ALJ wrote:

> In September 2005, Dr. Merola opined that the claimant was limited to sitting and standing/walking less than 2 hours a day and never able to lift or carry less than 10 pounds since March 15, 1995 (Exhibit B17F).   Dr. Merola's treatment notes from 1991 to 2000 do not show significant examination of the lumbar spine or extremities and most reflect acute complaints from upper respiratory infections to weight loss assistance.  These treatment notes do not support the limitations listed by Dr. Merola in this assessment and it is written well beyond the period in question.  Dr. Merola's notations on the assessment are too brief to support his opinions and do not include detailed findings or test results.  Reviewing his medical notes in earlier exhibits suggests examinations were performed by Dr. Merola's physician's assistant and were very brief.  These notes are very cryptic and have very little actual findings.  Therefore, this opinion is given little weight.

> In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . .   The undersigned also considered opinion evidence . . . .

 [AT 269].

Plaintiff argues that the ALJ erred because he did not cite to any medical evidence other than the doctor's own treatment notes as evidence that Dr. Merola's opinion was inconsistent, and because he did not seek additional information from Dr. Merola to clarify any ambiguity or conflict.

The ALJ must give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Rosa v. Sullivan, 168 F.3d 72, 78–79 (2d Cir. 1999) (citations omitted); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  When the record reflects that a treating physician's opinion was "not well-supported by clinical findings and was contradicted by substantial evidence," the ALJ may reject the treating physician's opinion without offending the substance of the treating physician rule.  Klodzinski v. Astrue, 274 Fed. Appx. 72, 73 (2d Cir. 2008) (quoting Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)).  When a treating physician's opinion is not afforded controlling weight, the following factors are considered in determining the weight given: (i) length of the treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship; (iii) medical evidence supporting opinion; (iv) degree to which the opinion is consistent with the record as a whole; (v) specialization of the physician; and (vi) other relevant factors.  20 C.F.R. §§ 404.1527(d) ; 416.928(d).

The ALJ pointed out that Dr. Merola repeatedly noted that Plaintiff needed to undergo a comprehensive physical examination (AT 268).  However, when one was scheduled in January 2001, Plaintiff failed to show up for the appointment, and did not return until March 2001 (AT 268).  At  that point another comprehensive physical exam was recommended, but Plaintiff did not return to Dr. Merola's office again until January 2002 (AT 268).  The ALJ also pointed out that Dr. Merola's notes during the insured period showed that Plaintiff complained of, and was treated for, other maladies, but, for the most part, showed minimal complaints of severe back pain.  [See e.g. AT 268 (citing notes from December 2000 office

visit which "do not show any complaint of back pain"by Plaintiff )].  The ALJ concluded that Plaintiff's infrequent visits to his primary care physician with minimal complaints of back pain suggested that Plaintiff's back pain was not as limiting as alleged during the insured period or as determined by Dr. Merola in 2005. (AT 268).

Additionally, the ALJ noted that it appeared as though Dr. Merola's physician's assistant saw Plaintiff more often than Dr. Merola (AT 269).  "[N]urse practitioners and physicians' assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." 20 C.F.R. § 416.913(d)(1). Therefore, while the ALJ is certainly free to consider the opinions of these 'other sources' in making his overall assessment of a claimant's impairments and residual abilities, those opinions do not demand the same deference as those of a treating physician."  Genier v. Astrue, 298 Fed. Appx. 105, 108, 2008 WL 4820509, at * 4 (2d Cir. Nov. 5, 2008).

The ALJ also pointed out that Dr. Merola's reports were too brief to support his opinions and did not include detailed clinical findings and diagnostic test results conducted during the insured period. [AT 268-69].   While "[t]he ALJ has an 'affirmative duty to develop the record and seek additional information from the treating physician, *sua sponte*, even if plaintiff is represented by counsel' to determine upon what information the treating source was basing his opinions. " Catanzaro v. Comm'r of Soc. Sec., 2009 WL 2342466, at * 6 (W.D.N.Y. July 27, 2009) (quoting Colegrove v. Comm'r of Soc. Sec., 399 F. Supp.2d 185, 196 (W.D.N.Y. 2005)), this duty requires the ALJ only to develop the complete medical history for the twelve-month period prior to the date of last insured. See Harvey v. Astrue, 2008 WL 4517809, at *8 (N.D.N.Y. Sept. 29, 2008)("By statute, the ALJ is required to develop the

complete medical history for at least a twelve-month period prior to the date of application.")(citing 42 U.S.C. § 423(d)(5)(B) and 20 C.F.R. § 416.912(d)(2)).  This is because a claimant must be under a disability which commenced at a time when he met the insured status requirements for such benefits. See 42 U.S.C. § 423(a)(1)(A) (1994); 20 C.F.R. §§ 404.130, 404.131, 404.315(a), 404.320(b) (1998).  Evidence of an impairment which reaches disabling severity only after the expiration of a claimant's insured status cannot be the basis for the determination of entitlement to a period of disability insurance benefits, even though the impairment may have existed before a claimant's insured status expired and subsequently worsened. Arnone v. Bowen, 882 F. 2d 34, 37-38 (2d Cir. 1989); Koss v. Schweiker, 582 F. Supp. 518, 522 n. 3 (S.D.N.Y. 1984).  The ALJ was not required to give controlling weight to a treating source opinion rendered after Plaintiff's insured status expired on December 31, 2000 unless it was relevant to the period at issue.  The ALJ concluded that he would give "very limited weight" to Dr. Merola's opinions because most of his notes concerning Plaintiff's back condition were subsequent to the relevant period (AT 268) and concerned his condition after his insured status ended.  Further, there was substantial medical evidence in the case record that, during Plaintiff's insured period, he was not disabled. See e.g. AT 267-69. Therefore, the ALJ did not err by failing to seek additional information from Dr. Merola. See  Harvey v. Astrue, 2008 WL 4517809, at *8 ("The ALJ does not need to attempt to obtain every extant record of the claimant's doctor visits when the information on the record is otherwise sufficient to make a determination, and need not request more detailed information from the treating physician if the physician's report is a sufficient basis on which to conclude that the claimant is not disabled.").

>  **d.**          **Vocational Expert Testimony**

Plaintiff argues that, because the residual functional capacity (RFC) conclusion reached by the ALJ was "not supported by substantial evidence, the hypothetical question [posed by the ALJ to the vocational expert] was not a complete and accurate reflection of Hunt's limitations, and the vocational expert['s] testimony cannot provide substantial evidence for the denial" of benefits.  Plaintiff's argument is premised upon his contentions that the ALJ improperly rejected Plaintiff's subjective complaints of pain and improperly gave Dr. Merola's assessment little weight.  Because the Court has rejected these two arguments, the Court finds that the hypothetical presented to the vocational expert[3] was properly interposed, and the vocational expert's conclusion that jobs did exist was properly considered by the ALJ. Therefore, the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence.

## IV. CONCLUSION

For the foregoing reasons, the determination of the Commissioner is AFFIRMED.


**IT IS SO ORDERED.**

Dated:September 23, 2009




Thomas J. McAvoy
Senior, U.S. District Judge

---

[3]The ALJ asked the vocational expert "whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity." [AT 271].